[No. 23396. Department Two. January 6, 1932.]

VERENA KRAETTLI, *Respondent,* v. NORTH COAST TRANSPORTATION COMPANY, *Appellant.*[1]

[1]Reported in 6 P. (2d) 609.

*Bogle, Bogle & Gates* and *Sidney A. Moss,* for appellant.

*Kahin & Carmody, Frank P. Christensen,* and *Orlo B. Kellogg,* for respondent.

HOLCOMB, J.—In this action, respondent sued to recover more than twenty thousand dollars for personal injuries alleged to have been sustained by her by the negligence of appellant. A jury in the lower court allowed her nine thousand dollars, for which judgment was entered.

The case of respondent was substantially as follows:

On July 6, 1930, respondent was riding as a guest in a Ford coupe, driven by one Durrenmatt, traveling southerly on the Pacific highway about twelve miles north of Vancouver, Washington, followed by a stage belonging to appellant. An automobile immediately in front of the Durrenmatt car suddenly came to a stop, and Durrenmatt, in order to avoid a collision, made an emergency stop and was struck from the rear by the stage. As a result of this collision, respondent alleged that she sustained a simple fracture of the skull, a scar in the vicinity of the right mastoid prominence, chronic edema of the brain, and was still suffering from what is referred to as traumatic neurasthenia or traumatic neurosis.

She was attended on the day of the accident and for several days thereafter by Dr. Armstrong of Vancouver, Washington. Dr. Armstrong caused the wounds to be sutured and dressed, and she was then driven to the farm home of friends in Oregon.

When the collision occurred, the stage struck the Ford coupe a heavy blow in the rear. Respondent received a severe jerk and snap of the head and neck, a severe blow upon the back of her head behind the right ear, causing a cut which left an irregular scar

estimated to be from two to three inches in length. She also received several lacerations of the scalp and a number of other bruises. She bled a great deal in the region of the right ear and the right side of her lower scalp and neck, which bleeding was sufficient to soak her clothing and the bandages and towels with which it was attempted to stay the flow of blood. The next thing respondent could recollect after the collision was that she was standing outside the automobile, and very faint and dizzy.

When she arrived at the farm home of her friends in Oregon, she had something to eat and went to bed immediately. She groaned greatly throughout the night, which was overheard by the farmer. She had considerable pain in her whole head. During the next few days, she was taken to Dr. Armstrong's office on several occasions, where the wound was dressed, but no X-ray or further examination appears to have been made. At no time while she was at the home of her friends following the accident was she free from suffering.

On August 5, in Seattle, where she was then making her home, she felt it necessary to consult a Dr. Dickerson, a brain and neurological specialist. She remained under his care for some time. At no time has she been continuously free from suffering since the accident, suffering from violent headaches and from pressure within her head. When suffering from such headaches and pressure, she often turns dizzy and is compelled to lie down for relief. She is afflicted with such dizzy spells upon awakening, and frequently about seven or eight o'clock in the morning. She is unable to sleep or rest satisfactorily and often when she tries to arise she is dizzy and falls back.

After first awakening, she often falls into a heavy sleep, at which times she suffers from various illusions,

such as a feeling of cold or paralysis, and at other times has the illusion that she hears her mother talking to her and her brothers and sisters. She frequently suffers from sharp pain behind the right ear where she was hurt, and other pains and aches which she had difficulty describing, but which appeared to have been manifested in the upper part of her head, as distinguished from the lower skull, in which the sharp pain was experienced. She is afflicted with nervousness and a lack of what one expert medical witness called "balance."

She was unaware that she had sustained a fracture of her skull until some weeks after the accident, when that was disclosed by X-rays which were then taken for the first time. She had been attending a business college prior to the accident, and in February, 1931, about eight months after the accident, she attempted to resume her business college study; but after attendance at a business college for four half-days, she was compelled to abandon it, because of the intense pain and pressure which made study unbearable.

She was about thirty-three years of age at the time of trial and had always been a strong, healthy, active woman. She suffered other female irregularities attributed to the injuries received in the collision. Her hair was turned gray within about seven months after the accident.

On appeal, the first error assigned and argued is in permitting certain physicians to testify as to statements respecting past pain and suffering made to them by respondent during examinations of her, for the sole purpose of qualifying them to testify as experts.

This assignment relates specifically to the testimony of two physicians named Drs. Stewart and Kelton.

The objection to the testimony of Dr. Stewart

is easily determined. He did not make his examination for the purpose solely of testifying as a witness. He was called by Dr. Dickerson, her attending physician in Seattle, to examine respondent and make suggestions as to what to do for her, purely from the mental side. He was, therefore, called as a consultant with Dr. Dickerson, and appellant makes no objection to the testimony of Dr. Dickerson as to her statements to him concerning past pain and the condition of respondent after the accident, nor any pretense that his testimony was inadmissible. The testimony of Dr. Stewart stands upon the same ground.

In no decision or text that we have been able to find, after reading most of the many cases cited by appellant, has it ever been held that physicians called for the purpose of effecting a cure of a patient are not permitted to testify as to statements of the patient's past pain and suffering made to them by the patient, which are, of course, statements of subjective symptoms.

The next assignment is that the trial court erred in permitting a medical witness to express an opinion as to respondent's physical condition, based partly upon his examination and partly upon the statements of respondent as to subjective symptoms made while the physician was examining her, not for the purpose of treatment, but to enable him to testify at the trial. This objection refers specifically to the testimony of Dr. Kelton.

As to the testimony of Drs. Kelton and Stewart, the trial court gave an instruction to the jury:

"Doctors Kelton and Stewart, of the physicians called as witnesses on behalf of the plaintiff, were permitted by the court to testify as to what the plaintiff stated to them regarding her condition. The sole purpose of the court in admitting this testimony and the sole purpose for which you are to consider it is in order

to enable you to determine the weight to be given by you to the opinions or conclusions stated by such physicians. In other words, you are not to consider such testimony for the purpose of determining whether or not the plaintiff actually experienced these symptoms, or in fact was in the condition claimed. You will determine from all the other evidence in the case, including the testimony of the plaintiff, whether or not the matters related by the plaintiff to the physicians were true, and if you find that they were not true or never had existed, then you will disregard so much of the opinions or conclusions of these medical witnesses as were based upon such untrue or nonexistent statements or symptoms.''

Since Dr. Stewart was clearly entitled to testify as one of respondent's physicians, it remains to determine the legal competency of the testimony of Dr. Kelton, which could be sustained because it was given in answer to a hypothetical question, which included all the elements of the cause of the injury and the subjective statements of past pain. The trial judge permitted this testimony and limited it solely upon the rule announced by this court in *Estes v. Babcock,* 119 Wash. 270, 205 Pac. 12. We there said:

''It is further urged that the court erred in permitting a physician, called as an expert witness, to testify as to statements made to him by Mrs. Estes regarding her condition, upon which he based his opinion. Such evidence is admissible for the purpose of affording the jury some means of determining the weight to be given to the opinion of the physician, but not as evidence tending to prove the actual condition of the patient at the time. This, we think, is the general rule. *Barber v. Merriam,* 11 Allen 322; *Shenandoah Valley Loan & Trust Co. v. Murray,* 120 Va. 563, 91 S. E. 740; *Acme Cement Plaster Co. v. Westman,* 20 Wyo. 143, 122 Pac. 89.''

Appellant here urges that the same situation did not exist in that case as in this, and that that case is not

authority for the instruction given here; and that it is opposed to the rule in about twenty-seven jurisdictions, including the supreme and several other Federal courts.

An examination of the brief of appellant in that case shows that the assignment of error urged was:

"The Honorable trial court erred in admitting the testimony of Dr. H. E. Allen as to statements made to him, not for the purpose of treatment, but in order to enable him to testify as a witness. Dr. Allen was employed by the plaintiff, not for the purpose of diagnosis or treatment, but solely in order to enable him to testify as an expert witness at the trial. The doctor did not see the plaintiff until a few hours before he testified."

It is thus seen that the situation in that case was precisely the same as in this. The instruction limited the purpose of the testimony as there prescribed.

Appellant also refers to the case of *Flessher v. Carstens Packing Co.*, 93 Wash. 48, 160 Pac. 14, as being contrary to the overwhelming weight of authority and should be overruled. In that case, two physicians were permitted to express the opinion that the ailments of plaintiff had been caused by eating contaminated beef purchased from defendant. These physicians did not attend plaintiff, and it was contended that their opinions should have been excluded as hearsay because they were based in part upon the history of the case. Thereafter, these physicians expressed similar opinions based entirely upon a hypothetical state of facts.

In that case, after holding that the evidence was not inadmissible as hearsay, we observed:

"It is obvious that no intelligent examination could have been made nor any intelligent opinion expressed without taking into consideration both the subjective and objective symptoms."

After independent investigation and reading a great many cases cited by both appellant and respondent, we are not disposed to overrule the *Estes* and *Flessher* cases as being opposed to sound reasoning and authority. Our rule is sustained by Wigmore (1 Wigmore, Evidence [2nd ed.], §§ 687, 688). Our cases have stood as rules of practice in this state ever since their rendition. Although it appears that the supreme court of the United States and most Federal courts follow a more restricted rule as to such evidence, we are not bound thereby. Judicial vacillation, except for very cogent reasons, is to be avoided. We are bound by the rule of the decision in this state until authoritatively overruled. *Mattingley v. Oregon-Washington Railroad & Navigation Co.,* 153 Wash. 514, 280 Pac. 46.

See, also, *Poropat v. Olympic Peninsula Motor Coach Co.,* 163 Wash. 78, 299 Pac. 979; *Pellerin v. Washington Veneer Co.,* 163 Wash. 555, 2 P. (2d) 658; *Johnson v. Bangor Ry. & Electric Co.,* 125 Me. 88, 131 Atl. 1; *Cronin v. Fitchburg & L. St. Ry. Co.,* 181 Mass. 202, 63 N. E. 335, 92 Am. St. 408; *Chicago, R. I. & P. Ry. Co. v. Jackson,* 63 Okla. 32, 162 Pac. 823; *St. Louis & S. F. R. Co. v. McFall,* 63 Okla. 124, 163 Pac. 269; *Cleveland, C., C. & I. Ry. Co. v. Newell,* 104 Ind. 264, 3 N. E. 836, 54 Am. Rep. 312; *State v. Gedicke,* 43 N. J. L. 86.

The testimony of Dr. Kelton as an expert was given principally in answer to a hypothetical question propounded to him, which appellant contends contained certain elements not disclosed by the evidence. One thing was in relation to a certain episode during the trial, which was undoubtedly in the presence of the court and jury. There was no error in including that as a part of the hypothetical question. Other elements

of the hypothetical question were sufficiently covered by evidence before the jury.

Another prominent error of which appellant complains is in the refusal of the trial court to reduce the amount of the verdict.

The testimony of the experts for each party was in sharp conflict as to the reality, nature and extent of the injuries to respondent, and the probable permanence thereof. These questions were determined by the jury on the conflicting evidence, and after an examination of the items of injury upon which the recovery was based, we are unable to disturb the award of the jury.

The verdict and judgment are based upon legally competent, evidentiary support, and must be sustained.

Affirmed.

TOLMAN, C. J., BEALS, MILLARD, and MAIN, JJ., concur.